UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

CHRISTOPHER GIESEKING,

                  Plaintiff,

vs.

MICHAEL THOMAS,

                  Defendant.

BR case no. 04-60786

Adversary case No. 05-6000

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

This adversary proceeding boils down to a disagreement between two former business associates as to whether one fraudulently caused—or, at least, fraudulently allowed to occur—a business loss to the other.  After hearing extensive evidence at trial, the Court concludes that this case, while it results from the dashed hopes and dreams of both men, did not involve fraud, and therefore that the defendant's debts are dischargeable under the Bankruptcy Code.[1]

## I. PROCEDURAL HISTORY

On January 20, 2005, plaintiff Christopher Gieseking filed an adversary complaint in the underlying Chapter 7 bankruptcy of defendant Michael Ray Thomas and Thomas' wife.  The complaint consisted of three counts: Count I alleged non-dischargeability of a debt under 11 U.S.C. § 523(a)(2)(A); Count II objected to

---

[1] This case arose prior to October 17, 2005, and therefore is governed by the pre-Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 Bankruptcy Code.

discharge under 11 U.S.C. § 727(a)(3); and Count III objected to discharge under 11 U.S.C. § 727(a)(5).   On February 18, 2005, Thomas filed a motion to dismiss the complaint.  Docket No. 5.  Chief Judge Kenneth J. Meyers denied the motion to dismiss on March 8, 2005, and set the matter over for trial.  Docket No. 11.

Prior to trial, the parties stipulated to the dismissal of Count II (Docket No. 27), and the Court granted the parties' request.  Counts I and III are before the Court.

## II. STATEMENT OF THE FACTS

### A.     <u>The Parties</u>

#### 1.     *Plaintiff Christopher Gieseking*

The plaintiff, Christopher Gieseking, graduated from Michigan Technological University with a B.S. in metallurgy engineering.  March 2, 2006 Transcript of Trial Proceedings on Complaint Objecting to Discharge and To Determine Dischargeability Before Honorable Pamela Pepper at 16, <u>Gieseking v. Thomas</u>, docket no. 05-6000 (2005).  To obtain that degree, he studied physics, chemistry and math; he did not take any business classes.  <u>Id.</u> at 17.

After graduation, Gieseking held a number of jobs.  He was a metallurgist, a glazier, a commercial development engineer, and a project manager before he became a program manager for industrial processes at a company called MG Industries. <u>Id.</u> at 17-19.  Until he left MG Industries, Gieseking never had operated his own business, and never had dealt with the financial aspects of a business.  <u>Id.</u>

2

at 20.

2.    *Defendant Michael Thomas*

While working at MG Industries, Gieseking met the defendant, Michael Thomas. Id. at 21. Thomas graduated from Bradley University with a degree in finance. Id. at 112. While educated in finance, Thomas was not an accountant. Id. at 166. Thomas worked for some time as the general manager of a company that sold semi-trucks, id. at 112; then, in October of 1995, he started a company called Material Enhancement, Incorporated ("MEI"). MEI developed and manufactured cryogenic cooling equipment for extrusion systems, food systems and water systems, as well as for other purposes. Defendant's proposed finding of fact No. 4–Docket No. 20.

Thomas was the primary shareholder of MEI. When he started MEI, he had no experience in the field of cooling technologies. He found customers by calling on heat treating facilities and manufacturing plants and discussing opportunities. March 2, 2006 Transcript at 113. Thomas personally fabricated the units for sale and did the selling for MEI. Id. at 114.

B.    **The Beginning of the Relationship**

After meeting Thomas, Gieseking accepted a job offer from him, and began working for MEI in April of 2000 as a nitrogen engineer. Id. at 21. Thomas testified that he felt that Gieseking's expertise and skills added a lot of value to the company. Id. at 115. Gieseking testified that he knew when he joined MEI that

3

MEI used a cryogenic thermal process–a process similar to heat-treating metal, except that it treated metal with cold.  Gieseking also knew that Thomas was trying to develop this process for cooling plastic extrusions.  Before joining MEI, however, Gieseking knew nothing about MEI's financial condition. <u>Id.</u> at 22.

### C. **MEI's Financial Condition**

Thomas testified at trial that MEI never turned a profit, and that the company lost money every year.   March 3, 2006 Transcript of Trial Proceedings on Complaint Objecting to Discharge and To Determine Dischargeability Before Honorable Pamela Pepper at 74, <u>Gieseking v. Thomas</u>, docket no. 05-6000 (2005).  It did not make money in 2000–the year Gieseking joined it.  March 2, 2006 Transcript at 115, 123.  The company's 2000 tax return reflected gross receipts of $1,844,786, and listed $574,543 as a loss for the year.  <u>Id.</u> at 118.  The company was not meeting payroll on a regular basis at that time, and was issuing payroll checks in anticipation that they would be paid later.  <u>Id.</u> at 120.  That same year, Thomas made a salary of $138,021.09. Even though the company was not making money, Thomas testified that he doubled his pay that year because the company was doing more business.  March 3, 2006 Transcript at 74.

### D. **Gieseking's Investment in MEI**

Gieseking testified that he was aware of the company's cash flow issues.  March 2, 2006 Transcript at 94-95.  Nonetheless, he testified that he told Thomas that he was interested in becoming a partner.  <u>Id.</u> at 121.  Gieseking and Thomas

4

stipulated at trial that in June of 2000–approximately two months after he began working at MEI–Gieseking invested $200,000 in the company, and became a seven-percent shareholder. Id. at 24. The money Gieseking invested was used for the ongoing operation of the business. Id. at 121. Gieseking testified that some of the money he loaned to MEI came from refinancing his home; the refinancing generated $35,000, and Gieseking loaned most of that amount to MEI. Id. at 87.

Gieseking testified that, over time, he provided other forms of financial assistance to MEI. These included foregoing reimbursement for travel expenses, providing material for projects, and providing money for payroll. Id. at 26-27. Beginning in July of 2000, there were times when Gieseking went without being paid his salary, as did other MEI employees. Id. at 93-94. Gieseking testified that the loans, and his foregoing of expenses, were advances to keep MEI in business, and that he made these loans and advances to MEI, not to Michael Thomas. Id. at 98.

In July of 2000, shortly after making the $200,000 loan to MEI, Gieseking created a spreadsheet to keep track of the money he believed MEI owed him. Id. at 29. Gieseking testified that over time, he added columns or information to the spreadsheet as he saw fit. Id. at 90. He applied a twelve-percent interest rate to the amounts he believed he was owed. Id. at 32. At the end of the calendar year of 2001, Gieseking calculated that MEI owed him $127,471.24 without interest, or $141,807.67 with interest–on top of his original $200,000 investment. Id. at 35.

5

In addition, Gieseking added to his list a debt of $75,000 for a tax liability he incurred in 2000. The tax liability arose because Gieseking had pulled some of the funds he lent the company out of a retirement account. Id. at 34. Although Gieseking's's broker advised him in July of 2000 that there would be a tax liability for making a withdrawal from his 401(k), Gieseking's testified that he did not make the $75,000 tax liability entry on his spreadsheet until January 1, 2002, a year and a half later. He further testified that the $75,000 number was a "ballpark" number. Id. at 85.

Gieseking's testified that he never received an accounting of the use of the funds he lent MEI, and that no one gave him access to the corporate financial documents. He testified that he expected to be reimbursed the monies listed in his spreadsheet when there was an investment in MEI, or when the technology took off. Id. at 36.

At trial, Thomas' recollection was somewhat different than Gieseking's. Thomas testified that he had an open-door policy, and that Gieseking had access to company financial information. If Gieseking asked for information, Thomas testified, Thomas gave it to him. March 3, 2006 Transcript at 67. Thomas also testified that Gieseking gave Thomas reports of the amounts Gieseking claimed he was owed, which Thomas occasionally reviewed. Thomas testified that he had disputes with some of the items on the reports. March 2, 2006 Transcript at 122. There appears to be no dispute, however, over the fact that Thomas did not

personally guarantee Gieseking's loans to MEI. Id. at 97.

E. **The Outside Investors–Late 2001**

Gieseking testified that between the time he joined MEI and December 2001,
Thomas told him that the business was improving, and that there was some outside
investment interest. Id. at 37-39. But MEI did not, in fact, make money in 2001.
Id. at 123. Thomas testified that he dropped his salary compensation in 2001
because of MEI's substantial cash flow problems. March 3, 2006 Transcript at 75.
He testified that he provided cash advances from his personal account to MEI in
December of 2001 to make ends meet, because the business was not generating
enough cash on its own to stay in business. Id. at 30-32.

Gieseking testified that in late 2001, Thomas told him that two gentlemen
would be bringing funds into the company, which would give it operating cash in
order to move forward. Gieseking recalled that Thomas told him that as a result of
their investment, the men wanted control of the company (March 2, 2006 Transcript
at 39-40); in other words, Gieseking and Thomas would have to, for all practical
purposes, sell MEI to the investors. The two interested investors, Gieseking
testified, were named John Wolff and Ken Hendricks. Id. at 40.

Thomas testified that he had met John Wolff at a customer's business.
Wolff's plastics company was working with MEI on its cooling technology. After
Wolff retired from his company, he approached Thomas and said he would like to
become part of MEI. Id. at 130-131. Thomas' father met Ken Hendricks at a boat

7

show, and flew him to MEI's plant. Hendricks looked at the plant and decided he wanted to invest in it. Id. at 131. At some point prior to January 2002, John Wolff and Ken Hendricks each made an investment of $500,000 in MEI. Id. at 132.

Thomas testified at trial that he understood that selling MEI to Wolff and Hendricks would provide cash that would pay debts of MEI, pay back certain shareholders over a five-year period (including Gieseking–id. at 122), and generate new business. Id. at 132.

F. **The Sales Transaction**

1. _First Week of January 2002_

Gieseking testified that he first received information about a proposed sale of MEI on January 5, 2002. Id. at 46-47. Gieseking testified that he was more than happy to have funds come in and to continue as an employee. Accordingly, Gieseking said that when he learned of the proposed sale, all he wanted for himself was to be paid the monies outlined in his spreadsheet. Id. at 39-40. Gieseking testified that in January 2002–at the time he became aware of the proposed sale–he was aware that MEI had outstanding bank loans. He testified that he had no idea of the company's value, but said that he had a conviction to build the business. Id. at 101.

In addition to investors John Wolff and Ken Hendricks, the parties involved in the sale on the MEI side were Gieseking, Thomas, and an investment group ("the Schultz shareholders") that included Michael Thomas' father, Charles Thomas.

8

According to Gieseking, Michael Thomas directed the transaction, and Thomas' father, also a shareholder in the company, served as Thomas' lawyer. Id. at 40, 176-178. Thomas testified that he did not have a lawyer. Id. at 152.

Gieseking testified that on January 6, 2002–the day after he learned of the proposed sale–Gieseking spoke with Thomas and expressed some concerns that he wanted addressed; that is, he wanted to be paid his back pay, deferred expenses and the $75,000 tax liability. The two men discussed the tax liability, and Gieseking stated he would not go forward with the sale unless that was resolved. Later that week, Gieseking retained an attorney, Mark Potashnick. Id. at 47-48.

2.    *January 18, 2002*

Gieseking testified that on January 18, 2002, Michael Thomas forwarded him an e-mail. The forwarded e-mail was from MEI's attorney (Scott Warner, id. at 133), to Ken Hendricks' lawyer (Karl Leo, id. at 134), Michael Thomas, John Wolff, Thomas' father, Mark Potashnick (Gieseking's attorney), and others. According to Gieseking, the e-mail announced the transmission of a group of documents that constituted the legal framework for the sale, and indicated that changes to these documents would arrive separately. It further stated that Thomas had prepared a new set of schedules that had to be reviewed by all the recipients before closing, and that the schedules would be attached to a final copy of the agreement. Id. at 48-49.

Gieseking testified that he contacted his lawyer to review the documents, and told Thomas that he was sending the documents to his attorney. (Id. at 50).

9

Gieseking testified that he was told–he did not state by whom–that 2.4 million dollars would be coming into the company. Id. at 103. The documents of January 18th indicated that one million of the 2.4 million would be paid back to Hendricks and Wolff. Gieseking testified that he was unaware of this at the time of closing, but acknowledged at trial that this information was in the documents. Id. at 104.

Thomas testified that money generated from the transaction described above would help pay company liabilities, but would not provide sufficient operating cash to move the company forward. So, according to Thomas, the documents included a provision that the parties would use reasonable commercial efforts to obtain sufficient bank financing after closing. March 3, 2006 Transcript at 35-36, 92-94. Thomas testified that prior to closing, the new legal entity which would succeed MEI–Material Enhancements International, LLC ("MEI, LLC"), had applied for financing with U.S. Bank, First National Bank of Dietrich and Bank of America, but that financing had not been approved at the time of closing. A loan commitment letter arrived shortly after closing. Id. at 95-96. Thomas testified that at the time of the closing, the cash on hand would have funded the business for approximately 30 days. Id. at 92.

Gieseking testified that Thomas did not tell him, and that he was unaware, that at the time of the closing, the company had fewer than 30 days of working capital on hand. He testified that he would not have agreed to the sale if he'd known the status of the working capital for the company. Id. at 110.

10

3.    *January 21, 2002*

Gieseking testified that on January 21, 2002, he received an e-mail from Thomas' father, Charles Thomas. March 2, 2006 Transcript at 50-51. The e-mail asked, "Are you okay with everything and ready to close?" Id. at 52. Gieseking further testified that on the same day, and at his direction, his attorney wrote a letter to MEI's lawyer, Thomas' father and Hendricks' lawyer, indicating that Gieseking would like to have the funds itemized in his spreadsheet paid to him as a condition for closing the sale. Id. at 55. Thomas testified that after Gieseking's lawyer sent the letter, Gieseking went to Thomas to talk. Id. at 88-89.

Gieseking testified that at this meeting, Thomas was upset, and told Gieseking of his fear that Gieseking's demand for payment "would torpedo the deal." Id. at 56. Thomas testified that he felt that the company would not survive if it did not get the cash from Wolff and Hendricks. Id. at 142, 148; March 3, 2006 Transcript at 37. Gieseking testified that Thomas asked Gieseking to prepare a second e-mail, stating that his attorney's communication was premature and that certain items should be disregarded. Gieseking testified that Thomas told him that the amounts due Gieseking would be paid. March 2, 2006 Transcript at 58. Gieseking testified that he took notes of his conversation with Thomas, which took place late in the evening of January 21st. Id. at 59.

Thomas agreed at trial that he was concerned about the consequences if the sale to Wolff and Hendricks didn't go through. At the time of the closing, MEI owed

11

the Internal Revenue Service about $285,000. Thomas testified that there was no way to pay that debt if the transaction didn't close. March 3, 2006 Transcript at 38-39, 65. He stated that the amount due employees for back pay was $342,112. Id. at 39-40. And, Thomas testified, he was concerned about recouping his investment–and Gieseking's–and giving the company an opportunity to go forward. Id. at 89. If the sales transaction did not go through, Thomas testified, MEI, Inc. probably would have filed for bankruptcy. Id. at 65.

Thomas testified that he never told Gieseking that he personally would repay the amounts owed to Gieseking by MEI. Id. at 64. Thomas also denied directing Gieseking to send an e-mail to the attorneys to indicate he was agreeing to the sales transaction. March 2, 2006 Transcript at 144. Thomas testified that he never forced or compelled anyone to sign the sales agreement. March 3, 2006 Transcript at 37. Nor did he do anything to purposely mislead any of the investors. Id. at 66.

    4.    *January 22, 2002*

Gieseking testified that he believed Thomas when Thomas told him at the meeting the night before that he would get paid, because he trusted Thomas. Gieseking testified that he understood that he would be paid some money after the closing and more over time after the closing. Gieseking expected that after the sale, the employees would be reimbursed for their back expenses, that MEI would have money to move forward and that the technology of the business would be developed. March 2, 2006 Transcript at 63-64, 105. Accordingly, the following morning, on

12

January 22, 2002, Gieseking drafted an e-mail according to the notes he had taken at his meeting with Thomas, and sent it to MEI's counsel, Hendricks' counsel and Thomas' father. Id. at 61.

Gieseking testified that he voluntarily signed the documents connected with the sales transaction around 9:00 a.m. on January 22, 2002. Id. at 67, 107. He testified, however, that when he signed the documents, he did not have an opportunity to review the closing book. He stated that he saw several sets of signature pages on a large table, and that he and Thomas both signed them. Id. at 67-68. Later in the day on January 22, 2002, Gieseking received an e-mail. The e-mail was sent at 1:09 p.m., and went to, among others, MEI's attorney, Michael Thomas, Gieseking, John Wolff, Thomas' father and Gieseking's attorney.[2] The e-mail was accompanied by a new set of financials and assumed liabilities. Gieseking stated at trial that he did not see the e-mail at the time that it was transmitted. As a result, Gieseking did not see the new documents prior to executing the sale documents. Id. at 72-75. He further testified that he would not have agreed to the transaction if he had known that there were unresolved issues with regard to documentation. Id. at 73.

A balance sheet, prepared by employee Paula Thompson for MEI and made part of the closing binder, stated that total assets of MEI at closing were $3,693,776 and net income was $12,564.38. Id. at 170-171. Thomas testified to his belief that

---

[2] Gieseking did not identify the e-mail's sender at trial, but exhibit #13–the e-mail itself–indicates that Scott Warner, the attorney for MEI, was the author.

the balance sheets provided to the parties to the transaction were true and accurate. Id. at 205; March 3, 2006 Transcript at 51. Thomas testified that it was his intention at the time of the transaction to get everyone paid. He stated that the sale transaction was an effort to prop up MEI to continue to operate, become profitable and have resources to repay everything. March 2, 2006 Transcript at 206.

G.    **The Post-Sale Activity**

Thomas testified that after the sale transaction, the new entity, Material Enhancement International, LLC ("MEI, LLC") assumed every debt of MEI, Inc., and that only MEI, LLC had operations. March 3, 2006 Transcript at 82. Thomas said that the general business plan for MEI, LLC was to exploit and sell the technology and concentrate on the host of companies with whom it already did business. Id. at 61.

Thomas testified at trial that of the 2.4 million wired into MEI, LLC, Wolff and Hendricks each were wired back $500,000. March 2, 2006 Transcript at 133; March 3, 2006 Transcript at 42. He indicated that this left the new entity with 1.4 million dollars. March 2, 2006 Transcript at 133.

Thomas testified that the shareholders agreed at a date after the closing to pay the amounts due to employees in three equal payments throughout the year, rather than with payroll during the 2002 calendar year. He stated that the money for the first payment was on hand at the closing. March 3, 2006 Transcript at 95. Thomas testified that after the sale transaction closed, Paula Thompson disbursed

14

payments pursuant to the funding schedule.  March 2, 2006 Transcript at 173-174. The employees were paid $114,000.37–one-third of their back pay.  Id. at 175; March 3, 2006 Transcript at 40-41. Thomas indicated that after the first round of payments, he spoke with the employees and obtained their agreement to this arrangement.  March 2, 2006 Transcript at 155; March 3, 2006 Transcript at 94-95.

At the same time, Thomas' father was paid $100,000.  The Schultz shareholders were owed $319,969.97.  March 2, 2006 Transcript at 176.  At the time of the closing the Schultz shareholders were not paid this full amount.  Thomas testified that the remaining amounts owed to the Schultz shareholders were paid off over time. Id. at 182. He indicated that he had not personally guaranteed these loans and had not entered into them in his individual capacity.  Id. at 177.

Thomas testified that Gieseking had agreed the day before closing not to be paid.  Id. at 154.  Thomas testified that he and Gieseking had agreed that they would pay all of the other employees at closing before paying themselves.  Id. at 143. Indeed, Thomas testified that when the other employees were paid after the closing, he and Gieseking were not paid.  Id. at 175.  Both parties testified that Gieseking did not receive payment on any of the amounts due him after closing, but he did receive shares in the new entity.  March 3, 2006 Transcript at 75-76; March 2, 2006 Transcript at 34.

Gieseking testified that he also received payment of $34,762.91 in June 2002 for the sale of his shares in the original company.  He stated that, after the sale, the

15

new company pursued business, and that paychecks were stable for a significant period. March 2, 2006 Transcript at 76-77. Gieseking testified that he received his salary in January, February and March of 2002, and that the new company paid salaries beyond 30 days of the closing. March 3, 2006 Transcript at 112. In short, Gieseking admitted at trial that the company did move forward for a while after the sale. Id. at 114.

## H. **The New Entity–Material Enhancement International, LLC**

Gieseking testified at trial that the technology produced by the new entity was the result of his work. Thomas' counsel asked Gieseking his opinion on what would have happened to MEI, Inc. had the sale to Wolff and Hendricks not closed, resulting in the following exchange:

GIESEKING: Of the entire business that developed after that was based on the technology I developed. The crane, which is a system called coal gas generation, totally my technology, built entirely on my knowledge base. What do you think I would have done with that if I was faced with the process of not having money here and going and getting one place somewhere else? If you put me in that situation, I'm going to run out of money. I'm going to do something with my brain and make money.

BY [THOMAS' COUNSEL]:

Q. So, you could have left and gone somewhere else, but MEI, Inc. in and of itself couldn't carry - -

A. That whole technology was based on my capabilities and my credibility.

Q. Okay. And you were the main guy or the number

one - -

A.        The technology - -

                    *      *      *      *      *

Q.        As the number one, most important guy at MEI,
          Inc. that held the secret to the entire technology
          and operations of the company and with the ability
          to just take all of that terrific knowledge and
          experience and expertise somewhere else, if you
          didn't want to sign the sales transaction
          documents, then why did you?

A.        I was under the impression that there was plenty of
          operating capital to move forward, everybody was
          going to be paid, and we were going to move
          forward.

Q.        And the company did move forward for awhile;
          correct?

A.        That is correct.

Id. at 113-114.

In 2002 MEI, LLC generated roughly two-and-a-half million dollars in cash

revenue. Id. at 45. In the same year, MEI, LLC paid Thomas $160,000. Thomas

testified that his management agreement provided for him to receive $100,000 per

year, but because he was borrowing a lot of money to put into the company, Wolff

and Hendricks agreed to the additional money in order to service the debt. March 2,

2006 Transcript at 187; March 3, 2006 Transcript at 76. Thomas testified that in

2003–the year Thomas separated from the company–the company paid him

$82,673, which represented payment through August of that year. March 3, 2006

17

Transcript at 16, 76. Thomas' 2003 tax return lists income of $12,501 from MEI, LLC in addition to his compensation. So, adding that amount to the $82,673, Thomas received approximately $95,000. He testified that he received the $12,501 after he left employment with MEI, LLC. Id. at 77-78.

Gieseking testified that in 2003, cash flow for MEI, LLC became insufficient and checks bounced. Id. at 78. Thomas testified that in May and June of 2003, he wrote checks to MEI, LLC using his personal checking account. These were cash advances he made to the company. Thomas testified that he would not have advanced this money if he thought the company was going to cease operations. Id. at 17-18, 22-25, 63. By July of 2003, however, Thomas was no longer with MEI, LLC. Thomas stated that the MEI, LLC partners and Thomas had disagreements that led to Thomas' resignation, and he indicated that the company ran out of money. March 2, 2006 Transcript at 188, 190. Gieseking testified that the new company stopped operating in September 2003. Id. at 79.

Gieseking testified that sometime during 2003, before Thomas left MEI, Gieseking had discussions with Thomas about the amounts due him, and Thomas told him not to worry and that it would be taken care of. Id. at 78. Thomas testified that Gieseking never sent a letter demanding to be paid from the closing, and that Gieseking did not file a law suit until after the company closed in 2003. Id. at 206-207. As of the time of trial, Gieseking testified, he still owned shares of preferred stock. He testified that he received an IRS Form K-1 for 2005 that showed no

18

income. Id. at 79-80.

I.    **Personal Bankruptcy**

In 2004, Michael Thomas personally filed a bankruptcy case jointly with his wife. Id. at 194. Thomas testified that he read the bankruptcy schedules before he signed them, and that they were true and correct to the best of his knowledge. Id. at 195. In his schedules, Thomas listed a two-percent ownership in King's Acres Development. Id. at 195-96. King's Acres was a company that Thomas' father had established. Id. at 192. Thomas testified that his father gave him this two-percent interest, that he never put money into the company and that he never received a distribution from the company. Id. at 207-208; March 3, 2006 Transcript at 11. He testified that he never had tried to sell his two-percent interest in the closely-held corporation, which was operating at a loss. March 2, 2006 Transcript at 208-209.

On the bankruptcy schedules, Thomas valued the two-percent ownership interest at zero because, he testified, it had not made any money. Id. at 195-96. The tax return for King's Acres Development Company showed a loss of $510,962 for 2003. Thomas' Form K-1 for 2003 showed his portion of the loss for his two-percent ownership in the company to be minus $10,292. Id. at 208-209.

Thomas' schedules also listed a five-percent ownership in King's Acres Self Storage, LLC. Thomas testified that he valued this asset at zero, again because it had not made any money. Id. at 195-196. Thomas' tax returns for 1999, 2000, 2001 and 2002 also show losses for these interests. March 3, 2006 Transcript at 8-15.

## III.  ANALYSIS

### A.  <u>Section 523(a)(2)(A) Does Not Prevent Discharge of Thomas' Debt.</u>

Section 523(a)(2)(A) of the Bankruptcy Code holds that a general bankruptcy discharge does not discharge an individual debtor from any debt "for money [or] property . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ." In count I of the complaint, Gieseking asks the Court to find that Thomas owes him a debt, and to further find under § 523(a)(2)(A) that that debt is not dischargeable. This claim raises several issues for the Court to resolve: First, did Thomas, in fact, owe Christopher Gieseking a debt? Second, if Thomas did owe Gieseking a debt, was it a debt obtained by false pretenses or fraud?

#### 1.   *Burden of Proof*

"Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor." <u>Goldberg Securities v. Scarlata (In re Scarlata)</u>, 979 F.2d 521, 524 (7th Cir. 1992). The plaintiff bears the burden of proof when seeking to establish that a debt is non-dischargeable in bankruptcy. <u>Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)</u>, 895 F.2d 1170, 1172 (7th Cir. 1990). The plaintiff must meet this burden by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 279, 291(1991).

#### 2. *Distinction Between 11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B)*

Section 523(a)(2) of the Bankruptcy Code has two subsections, (A) and (B).

20

Subsection 523(a)(2)(A) provides that debts will not be discharged to the extent that the debtor obtained them by false pretenses, a false representation or actual fraud. Subsection 523(a)(2)(B) provides that debts will not be discharged if they were obtained by the use of a written statement that is "materially false, respecting the debtor's or an insider's financial condition, on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied, and that the debtor caused to be made or published with intent to deceive." In other words, subsection (B) bars the discharge of debts obtained by the use of false financial documents or statements.

The adversary complaint in this case alleges that Thomas' debt to Gieseking is non-dischargeable under § 523(b)(2)(A). At trial and in briefs, however, Gieseking argued that the financial documents that provided the framework for the sale of MEI, Inc. to Wolff and Hendricks did not reflect the true financial condition of the company. Subsection 523(a)(2)(A) does not bar discharge of debts obtained by the use of false financial statements; discharge of those debts is dealt with separately in § 523(a)(2)(B). Paragraphs (A) and (B) of § 523(a)(2) are mutually exclusive–the fact that Congress excluded debts obtained through use of false financial statements from paragraph (A), and dealt with those debts in a separate subparagraph (B), makes clear that a plaintiff must prove different evidence for each subsection.

Gieseking did not allege in the complaint that Thomas obtained money or property by use of false financial statements–he did not allege that the debt was

21

non-dischargeable under § 523(a)(2)(B).  He alleged only that Thomas obtained

money or property through false pretenses or fraud.  Accordingly, the Court does not

consider relevant any evidence presented at trial relating to the question of whether

MEI, Inc.'s financial statements presented an accurate picture of MEI, Inc.'s

financial situation at the time of the sale.

3.    *The Elements of a § 523(a)(2)(A) Non-dischargeability Claim*

In In re Maurice, 21 F.3d 767, 774 (7th Cir. 1994), the Seventh Circuit held

that to prove non-dischargeability under § 523(a)(2)(A), a creditor must establish

that: (1) the debtor obtained the money or property through a representation that

was false or was made with such reckless disregard for the truth as to constitute

willful misrepresentation; (2) the debtor had an actual intent to defraud; and (3) the

creditor actually and reasonably relied on the false representation.  In Field v.

Mans, 516 U.S. 59 (1995), the Supreme Court held that the creditor's reliance need

only be justifiable, but not necessarily reasonable, thus modifying the third criterion

the Seventh Circuit set forth in In re Maurice. In re Maurice, 21 F.3d at 774.

a.    Gieseking Has Proven That Thomas Obtained Benefits from
Gieseking's Agreement to Sell His Stock In MEI, Inc.

To prove that a debt is non-dischargeable under § 523(a)(2)(A), a creditor first

must prove that the debtor obtained money or property from the creditor. Gieseking

argues that Thomas obtained "property" from him when he obtained Gieseking's

"consent to the [sale of MEI, Inc. to Wolff and Hendricks] and his shares of stock in

Material Enhancement, Inc." (March 2, 2006 Transcript at p. 10, Opening

22

Statement of Plaintiff's Counsel.) Gieseking contends that Thomas benefitted in several ways from the sale of MEI, Inc.: Thomas got rid of certain liabilities, because the closing of the sale resulted in MEI, LLC assuming the obligations of MEI, Inc., which Thomas primarily owned and controlled; Thomas received an employment agreement with and stock in MEI, LLC; and Thomas' father, as one of the Schultz investors, received $100,000 in cash and stock in MEI, LLC.

As Gieseking appears to realize, it is difficult to view these "benefits" as "property" that Thomas obtained. Accordingly, Gieseking argued in his proposed findings of fact and conclusions of law that the "receipt-of-benefits" analysis should apply in this case.

Historically, there was discord among bankruptcy courts regarding whether "a debtor must personally possess or consume the money or services at issue in a false financial statement case before nondischargeability can apply." Bates v. Winfree, 34 B.R. 879, 882 (Bankr. M.D. Tenn. 1983). One view, expressed as early as 1913 by the Supreme Court of Minnesota, held that unless the debtor himself actually obtained money or property through false representations, the debt remained dischargeable. See Rudstrom v. Sheridan, 122 Minn. 262, 265-266 (Minn. 1913). A directly competing view emerged six years later in the New York Supreme Court, which held that "[i]f it is shown that the bankrupt derives a benefit from the property obtained he come within the provisions of the statute in question," regardless of whether the property passes directly to him. Hyland v. Fink, 178

N.Y.S. 114, 115 (N.Y. App. Div. 1919).  *See also*, In re Kunkle, 40 F.2d 563, 563-564 (E.D. Mich. 1930).

The third view, now called the "receipt-of-benefits" view, appears to have originated with Florida bankruptcy judge Alexander Paskay in 1983.  In Century First National Bank of Pinellas County v. Holwerda (In re Holwerda) , 29 B.R. 486, 489 (Bankr. M.D. Fla. 1983), Judge Paskay held that "[i]f the debtor benefits in some way from the property obtained through his deception, the debt is non-dischargeable." (Citing Hyland v. Fink, 178 N.Y. S. at 115, 3 *Collier on Bankruptcy*, ¶ 523.08[1] (15th ed. 1982)).  Underlying this theory is the belief that "a person will seldom go to the trouble of obtaining money by wrongful means unless the person realizes some benefit for himself, though the money actually goes to another." Id. at 883, quoting McCloud v. Woods (In re Tom Woods Used Cars, Inc.), 23 B.R. 563, 569 (Bankr. E.D. Tenn. 1982).

A number of courts have recognized this receipt-of-benefits theory.  *See, e.g.*, Bates v. Winfree, 34 B.R. 879 (Bankr. M.D. Tenn. 1983); Simmons v. Wade (In re Wade), 43 B.R. 976 (Bankr. D. Colo. 1984);  McHenry v. Ward (In re Ward), 115 B.R. 532 (W.D. Mich. 1990);  Barber v. Martin, 154 B.R. 490 (Bankr. C.D. Ill. 1993); HSSM #7 Ltd. Pshp v. Bilzerian (In re Bilzerian), 100 F.3d 886 (11th Cir. 1996). Gieseking urges this Court to adopt the receipt-of-benefits theory, and to find that the benefits he describes—the relief from corporate obligations, the receipt of an employment contract and stock, and his father's receipt of stock—constitute

"property" which was "obtained" by false pretenses.

The Court agrees with Gieseking that the "receipt-of-benefits" theory is applicable here. Judge Paskay's reasoning is compelling–whether for money or for some other benefit, people rarely go to the effort of defrauding someone if it does not result in some benefit to them. Accordingly, this Court adopts the "receipt-of-benefits" theory as outlined in the cases discussed above, and holds that if a debtor obtains a benefit of some sort due to fraud, the debt created by the fraud is non-dischargeable.

In this case, one could argue that Thomas received a benefit from Gieseking's agreement to sell his shares in MEI, Inc. The evidence indicates that the company was in dire financial straights at the time Thomas asked Gieseking to sell his shares to Wolff and Hendricks. Had Gieseking not agreed to sell his shares, it appears that the company would have gone under shortly thereafter–within, perhaps, 30 days or less–and might have been forced to file for bankruptcy relief. Gieseking's agreement to sell his shares resulted in a sale that kept the company functioning for a longer period than it likely would have done absent the sale. It did, as Gieseking argues, result in Thomas getting a job with the new entity and some stock in the new entity. It resulted in Thomas' father receiving some stock–arguably an indirect benefit to Thomas.

Accordingly, the Court concludes that Gieseking has proven that Thomas received benefits from him.

25

b.    Gieseking Has Not Proven That Thomas Obtained These Benefits By Making a Representation That Was False Or Was Made With Such Reckless Disregard For The Truth As To Constitute Willful Misrepresentation.

While the Court finds that Gieseking has met his burden in proving that Thomas obtained benefits from Gieseking's agreement to sell his MEI, Inc. stock, it finds that Gieseking did not present any evidence at trial to demonstrate that Thomas made any false representations to Gieseking. Nor does the Court find that any of the representations Thomas made to Gieseking were made with such reckless disregard for the truth that they constitute willful misrepresentation.

Gieseking argues that Thomas assured him that the sale would result in his getting paid. As evidence that Thomas knew that this assurance was false, Gieseking points to Thomas' testimony at trial indicating that Thomas knew, on the closing date, that the cash generated by the sale would not be enough to pay the significant debts (to the IRS and the employees for back pay) and keep the company afloat. Thomas testified at trial that, after closing on the sale and paying the debts to the IRS and the employees, there would be enough cash on hand to operate the business for 30 days; Gieseking argues that this demonstrates that Thomas knew—even as he was assuring Gieseking otherwise on the night before the sale closed—that Gieseking was not going to be paid.

It would be more correct to say that Thomas knew, as of the night before the sale closed, that Gieseking would not be paid out of the cash proceeds of the sale. This is not the same, however, as knowing that Gieseking never would be paid.

26

Indeed, immediately on the heels of testifying that the cash from the sale would not generate enough money to run the company for a long period of time, Thomas testified that the sale documents required the parties to make aggressive efforts to obtain financing. The purchasing entity had sought financing from three different banks, Thomas testified–and after closing, received a commitment letter from one of those banks.

Further, Thomas testified that even after the sale, well into the existence of MEI, LLC (the new entity), Thomas continued to believe that his plans would come to fruition, and that both he and Gieseking would recoup their losses. Unfortunately, Thomas did not foresee that he and the owners of MEI, LLC would reach a parting of the ways, and that by the end of 2003, Thomas would no longer be a part of MEI, LLC.

Gieseking operates from the assumption that Thomas, knowing full well that his assurances of repayment were false, nonetheless made them in order to get Gieseking to agree to the sale. The evidence, however, paints a different picture. The evidence indicates that Thomas truly hoped and believed–as did Gieseking–that the sale would result in a new life for MEI. Thomas believed that somehow, over time, the sale would allow MEI to pay its debts to the IRS and the employees, to get back on its feet financially, and to pay back all those who had invested in it. The record does not support the conclusion that Thomas was making false or reckless representations–it shows that he was making hopeful

27

representations. There is no evidence that Thomas had a crystal ball—that he could know that within three years after the sale transaction, MEI would be no more, Gieseking would remain unpaid, and Thomas himself would be forced into personal bankruptcy.

Gieseking also asserts that the financial documents that provided the framework for the sale closing did not reflect the true financial condition of the company. As discussed in Section III(A)(2) above, the Court finds that Gieseking is precluded from making this argument, because he did not plead the appropriate cause of action in his complaint.

Even had he pled under § 523(a)(2)(B), however, Gieseking still would find himself with proof problems in this Court's eyes. At trial, Gieseking sought to present the testimony of Michael Garvey, a turnaround consultant with the firm of Hearney Partners, LLC in Willowbrook, Illinois. March 2, 2006 Transcript at 236. The parties stipulated that Garvey was a qualified expert on accounting matters, based on his education and experience. Id. at 236.

Sometime after the sale, the president of MEI, LLC contacted Garvey, and asked him to review the validity of MEI's accounts. Id. at 238. Garvey reviewed MEI's general ledger, and he received assistance from some of the MEI employees in his review of the documents. Id. at 239. Garvey testified that he found questionable issues in regard to the accounts receivable. Id. at 240.

Garvey's first concern related to the finished goods inventory, which was

28

valued at market price instead of actual cost. Id. at 241. According to Garvey, cost was the proper way to account for inventory value. Id. at 242.

Another issue of concern to Garvey was the accounts receivable balances. Garvey expressed a belief that a large percentage of the receivables never existed. He based this conclusion on his discovery that these receivables were booked, then later reversed off the books without any cash being collected on them. According to Garvey, the receivables should not have been booked until the product had been delivered to the customer. Id. at 247, 275. He stated at trial,

> Money should have came [sic] in before any receivable was ever booked. Because a receivable cannot be booked until you deliver something to a customer. So until you deliver that to a customer, it's not revenue. It's not a valid receivable until I have actually provided a service to you or delivered a product to you, and you see that all the time. There's massive lawsuits about companies recognizing revenue before they actually should be recognized. And in this company's policy, it says they would receive a deposit before the equipment would be manufactured. So that meant that there should have been money received from these companies, cash payment received, before any receivable would ever hit the books. They would need that cash payment before they started manufacturing the part to deliver to somebody.
>
> So there would first be a cash receipt. Then they would manufacturer [sic] the part before any receivable was booked. Then they would be delivering that part before the receivable should be booked. That would be the valid accounting I would expect to receive from a company with these policies.

Id. at 275-76.

Garvey testified that his review showed that MEI received no cash on the accounts receivable listed on the balance sheet. Id. at 276. From this, Garvey

concluded that if any of those receivables that were completely reversed later on, it would lead him to believe the receivable never really existed. At the time he reviewed the balance sheet, he testified, 74% of the balance of receivables had been reversed off of the books. Id. at 247. Garvey further testified that he did not find purchase orders or sales contracts for the customers that were written off. Id. at 282-283.

Garvey testified that he thought the financial records were pretty complete, and that he could follow the trail of transactions fairly easily. Id. at 254, 281. The receivables were carried forward with no activity and were later written off. Id. at 249. He testified that this meant that the actual accounts receivable was much lower than what was presented on the balance sheet. Id. at 251. Garvey testified that it appeared to him that the financial statements were misrepresented at the time of closing. Id. at 253-254. He further testified that the effect of these types of misstatements would be to mislead investors and lenders. Id. at 256.

The Court did not find Garvey's testimony helpful. The Court has no reason to doubt the validity of Garvey's opinion that, under generally accepted accounting principles ("GAAP"), companies like MEI should book receivables only after delivering a product to a customer. But Thomas testified that MEI recorded sales before it had delivered equipment and before receiving a down payment, but not before there was an executed contract. March 3, 2006 Transcript at 101. And Garvey admitted on cross that some privately-owned companies do not maintain

30

their books in accordance with GAAP.  March 2, 2006 Transcript at 279.  The
evidence presented at trial gave the impression that, while Thomas was very good
at coming up with an innovative product, and while Gieseking was very good at
helping to create a system to manufacture that product, neither man was
particularly experienced or talented in the area of financial management.  It does
not come as a shock to the Court that this particular company may not have been
run in accordance with business management practices espoused in, say, the
Harvard Business Review.

Further, Garvey admitted on cross that when he prepared his report and did
his analysis, he did not contact or talk to Michael Thomas.  Id. at 280.  Had he done
so, he might have learned, for example, that the chart of accounts receivable that he
used, titled "Material Enhancement International, LLC Customer Ledgers from the
period of December 1, 2001 to June 30, 2003," did not list all of the customers with
whom MEI, LLC did business.  Nor did it list all of the revenue MEI, LLC received
from January 2002 through December 2002.  March 3, 2006 Transcript at  45, 51-
55, Thomas testimony.  Or that MEI, LLC did not come into existence until January
2002, so it did not have any customer ledgers for December 1, 2001.  Id. at 45-46,
Thomas testimony.  Or that one of MEI, LLC's customers, Crane Plastics Company,
did not pay in cash.  Rather, the two companies exchanged equipment.  Id. at 53, 60,
Thomas testimony.

Finally, Garvey admitted on cross that he did not contact any of the entities

31

listed in the accounts receivable chart to verify if they were, in fact, customers of MEI. March 2, 2006 Transcript at 282.

In short, Garvey's testimony that the financial statements presented at closing were false was based on both a lack of information about the particular company whose records he was reviewing and on a series of assumptions about how that company ought to have been run. No doubt Thomas–and Gieseking–could have taken many, many steps to better run MEI as a business. Indeed, the state of MEI's finances at the time Thomas began to consider a sale arguably might indicate that the business had not been run in an ideal fashion prior to that time. But a lack of business acumen and business management skills does not equate to fraud. There must be more, and in this case, Gieseking has not proven that there was more.

The Court also notes that Gieseking hired counsel to assist him in evaluating the sales transaction. The evidence presented at trial demonstrates that Gieseking used that counsel, providing him with sales documents and asking his advice. That lawyer advised Gieseking to express reservations about closing on the sale without having the funds Gieseking had advanced repaid. Yet Gieseking chose to proceed with the sale in spite of that advice. Gieseking now argues that this was because he was misled by Thomas–but Gieseking could have further discussed the transaction with his lawyer after talking with Thomas on January 21. He argues that he did not have an opportunity to review the closing documents at the time of the

32

closing–yet he did not ask for more time, or ask to have his attorney with him, or ask that his attorney review the closing documents. Gieseking made a number of critical decisions from the evening of January 21 to the end of the day on January 22–all, apparently, on his own. He now lives with the result of those choices.

      c.    There Is No Evidence that Michael Thomas Had An Actual Intent to Defraud Gieseking.

Likewise, the Court finds that Gieseking has failed to prove that Thomas had an actual intent to defraud Gieseking. Thomas seems to have been quite frank with Gieseking about the grim state of MEI's finances prior to the sales transaction. While Gieseking claims that Thomas did not share the fact that after the sale transaction, the new company would have only 30 days of operating capital on hand, it appears that Thomas nonetheless made it clear to Gieseking that the sale needed to go through in order for some vestige of MEI to survive.

The problem lies in Gieseking's interpretation of Thomas's optimism over the sales transaction. Thomas told Gieseking not to worry, that he'd get repaid. He seems to have told Gieseking that the sales transaction would breathe new life into the company. He told Gieseking that the sale would enable everyone to get paid, and would allow the company to go forward with developing its technology. Those statements are not really in dispute.

Gieseking, however, views those statements as factual–almost contractual–guarantees. Thomas–and this Court–view those statements as optimistic, hopeful assessments of what the sale could do for the company. The

33

main factor influencing the Court's view is this—like Gieseking, Thomas had invested in MEI. Thomas had every reason to want to see MEI succeed. When, only a short time later, the new entity failed, Gieseking was not the only person who lost something. Thomas lost his job—even before MEI closed. He lost at least part of his investments. And Thomas, of course, ended up in bankruptcy. It is not as if Thomas made some sort of killing on the sale. It failed for him as much as it failed for Gieseking.

Perhaps most telling is the fact that Gieseking has not pointed to any motive Thomas might have had to defraud him. He portrays Thomas as desperate, as someone who would do whatever it took to make MEI succeed, including commit fraud. But it appears that Gieseking, too, was willing to do whatever it took to make the company succeed—including borrowing from his 401(k) plan and re-financing his home. How could the sale of MEI to Wolff and Hendricks benefit Thomas without also benefitting Gieseking? And why would Thomas continue to assure Gieseking that he'd be paid long after the sale went through, if Thomas sought only to lull Gieseking into agreeing to the sale?

In short, while there is evidence of less-than-stellar business practices, faulty business judgment, mis-communication, and other problematic behavior, the Court finds no evidence that Thomas intended to defraud Gieseking when he assured Gieseking that the sale would benefit the company and result in Gieseking's being repaid. For all of these reasons the Court finds that Gieseking has failed to meet

his burden of proof on the second element of a claim of non-dischargeability under §

523(a)(2)(A)–that Thomas had an actual intent to defraud.

>    d.    Because There Was No False Representation, There is No
>          Evidence that Gieseking Justifiably Relied on a False
>          Representation.

Finally, Gieseking has failed to meet his burden of proof on the third element

under § 523(a)(2)(A), as modified–whether the creditor justifiably relied on the false

representation.  As discussed above, the Court has found no evidence that Thomas

made any false representations to Gieseking.  The Court finds that Gieseking chose

to forego immediate payment of his previous investments in the company in order to

increase the chances of its future success.  This was a decision with risks involved,

but one he admittedly made voluntarily.  Business investments involve risk.  Some

can be calculated and quantified, some cannot.  In this instance, much of the

decision-making appears to have been made, not on acquired business acumen or

calculated and measured risk, but on an optimistic vision of the future both men

held. The end result was not what either man anticipated.  No one came out a

winner in the end.

>    e.    Other Factual Considerations Support the Court's Conclusion.

While a creditor must prove that he justifiably relied on a false

representation in order to prove a claim under § 523(a)(2)(A), there is no

requirement that he prove that he was harmed by that reliance.  Nonetheless, the

Court notes that it is difficult to discern what it is that Gieseking thinks *should*

have happened on January 21 and 22 of 2002.

It is clear from the testimony at trial that both Gieseking and Thomas wanted to find some way to keep the company afloat. The evidence at trial demonstrates that Thomas, rightly or wrongly, believed that the sale to Wolff and Hendricks was the only way to accomplish that goal. It appears that, had the sale not gone through, the company would have collapsed altogether. Had that happened, Gieseking would have been out of a job *and* out his investment. Because the sale did go through, however, Gieseking continued to be employed at MEI, LLC through, it appears, its closing in September of 2003.

Thus, Gieseking seems to be arguing that he was coerced into agreeing to a sale that *prevented* him from losing both his job and his investment due to a corporate collapse. It seems a bit odd to complain about being coerced into doing something that prevented harm to oneself. But perhaps what Gieseking complains of is not so much being coerced into agreeing to the sale as being, in his perception, coerced into staying with MEI rather than leaving. As discussed above, Gieseking testified that had he realized that he wouldn't get repaid his investments, he would have taken his knowledge and expertise and gone somewhere else. In essence, then, he argues that he was somehow coerced into staying at MEI, LLC when he could have gone somewhere else.

Even if this had been the case–and there is no evidence that it is–it still remains unclear how Gieseking's leaving MEI and going to a new job would have

resolved his investment problem. In fact, had he decided to leave MEI when Thomas approached him with the idea of the sale, he may have been *less* likely to be repaid his investments. If Gieseking had left MEI in January 2002, he could either have held on to his MEI shares and scotched the sale, in which case–as pointed out above–he likely would not have recouped his investment due to the failure of the company. Or he could have agreed to the sale (just as he did) and then left, in which case it is not clear how his situation would have been any more favorable in terms of having his investment repaid. The only difference the Court can see in that scenario and the one presented at trial is that Gieseking might–*might*–have found himself a more stable job with a company that would not have collapsed some 21 months later.

At trial, Gieseking attempted to elicit testimony to prove that Thomas had given priority to some MEI debts over others (including Gieseking's) at the closing. For example, he attempted to argue that Thomas tried to pay the Schultz investors, which included the Thomas's father, before paying Gieseking. *See generally*, March 2, 2006 Transcript at pp. 177-185. This may well be true, but is not persuasive to the Court for several reasons.

Thomas testified that he never personally guaranteed the loans made to MEI–either by the Schultz investors (id. at p. 177) or to Gieseking (id. at p. 64). Nor did he pay the Schultz investors out of his own pocket–he paid them out of the proceeds of the sales transaction. Had Thomas personally guaranteed Gieseking's

loans, then paid the Schultz investors with his own funds ahead of Gieseking, the Court could see Gieseking's point. But Thomas made the choice to repay the Schultz investors in his capacity as a principal of MEI, and Gieseking presented no evidence demonstrating that Thomas' payment of the Schultz's was deliberately designed to avoid paying Gieseking.

Further, Thomas and Gieseking were the owners of MEI–the Schultz group was an outside investor group. As owners, Thomas and Gieseking had agreed to do something common for corporate management–they had agreed to pay their employees before paying themselves. Likewise, it is not unusual–and, many would argue, quite prudent–for management to repay outside investors before paying members of the management team. The fact that Thomas chose–if, indeed, Thomas was responsible for the choice–to pay outside investors before paying Gieseking (and himself) does not prove that he knew Gieseking never would be repaid. The situation is complicated somewhat by the fact that Thomas' father was a member of the Schultz investment group, but again, that fact does not prove that Thomas never planned on Gieseking seeing reimbursement.

    f.    Conclusion

Gieseking argues that Thomas preyed on him. The Court disagrees. Gieseking and Thomas met one another while engaged in business. They were each impressed with the other. They decided to go into business together, and each hoped it would work out. Both parties voluntarily put their own money into the

company because they wanted it to succeed. And both parties voluntarily entered into the sales transaction with Wolff and Hendricks because they wanted the company to be successful; Gieseking himself testified that he agreed to the sales transaction because he wanted the company–the technology that was based on his "capabilities"–to succeed. The company failed, in spite of both men's hopes. Both men suffered losses. This was not fraud–it was what happens to a large percentage of American businesses every day.

For the foregoing reasons the Court finds that Gieseking failed to prove by a preponderance of the evidence that this debt is non-dischargeable in bankruptcy under 11 U.S.C. § 523(a)(2)(A).

## B.   Count III - 11 U.S.C. § 727(a)(5) Objection to Discharge

In Count III of the complaint, Gieseking asked the Court to deny Thomas a discharge for failure to explain the loss of certain assets.

### 1.   *Burden of Proof*

Section 727(a)(5) is written broadly enough to give courts wide discretion to deny a discharge in cases where the debtor does not adequately explain the shortage, disappearance or loss of assets. Spirk v. Sullivan, ___ F.2d ___, No. 02 C 9228, 2003 U.S. Dist. WL 22048077 at *2 (N.D. Ill. Aug. 28, 2003).

> Initially, the party objecting to the discharge must demonstrate by a preponderance of the evidence that the debtor at one time owned substantial and identifiable assets that are no longer available for distribution to his creditors. [*Stathopolous* v.] *Bostrom* [*In re Bostrom*), 286 B.R. [352] at 364 [Bankr. N.D. Ill. 2002)]; *Sonders v. Mezvinsky (In re Mezvinsky)*, 265 B.R. 681, 689 (Bankr. E.D. Pa. 2001); [*Banner Oil*

*Co. v.] Bryson [In re Bryson]*, 187 B.R. [939] at 955 [(Bankr. N.D. Ill. 1995)]. If the party objecting to the discharge carries this burden, then the debtor must provide a satisfactory explanation for the loss of assets. *Banner Oil Co.*, 187 B.R. at 995; 11 U.S.C. § 727(a)(5); *see Mezvinsky*, 265 B.R. at 690.

Id. at p. 3. It is within the court's discretion to determine whether a debtor's

explanation for missing assets is "satisfactory." Id. (*citing Bostrom*, 286 B.R. at 364,

among others)

2.    *Discussion*

Under 11 U.S.C. § 727(a)(5), a court may deny a debtor a discharge if he or

she fails to explain satisfactorily any loss of assets or deficiency of assets to meet the

debtor's liabilities. A bankruptcy court has broad power to decline to grant a

discharge where the debtor does not adequately explain a shortage, loss, or

disappearance of assets. In re D'Agnese, 86 F.3d 732, 734 (7th Cir. 1996). In

rebutting a showing of missing assets, a debtor's explanation does not have to be

exhaustive, but it must "consist of more than [a] vague, indefinite, and

uncorroborated hodgepodge of financial transactions." Spirk v. Sullivan, ___ F.2d

___, 2003 WL 22048077 at p. 3 (N.D. Ill. 2003), *citing* Banner Oil Co., 187 B.R. at

956; Bostrom, 286 B.R. at 364-65.

In his trial brief, Gieseking contended that Thomas had failed to account for a

decrease in the value of the King's Acre's entities, and argued that Thomas failed to

explain a difference in MEI equipment value between March 31, 2002 and the date

of the bankruptcy petition. For this reason, Gieseking contended that Thomas

failed to adequately explain loss of assets and should be denied a discharge. The Court does not find support for the Gieseking's position in the trial testimony.

Regarding King's Acres, Thomas testified that he listed a two-percent ownership in King's Acres Development in his bankruptcy schedules. He valued this interest at zero, because it had not yielded any profit. He also listed a five-percent ownership in King's Acres Self Storage, LLC. He valued this at zero for the same reason. Thomas further testified that the King's Acres company showed a loss on its tax returns and that, in turn, his tax returns showed his portion of the loss for his two-percent ownership in the company. Gieseking provided no evidence to rebut Thomas' testimony on this issue. The Court finds that Thomas adequately explained the loss in regard to this asset, and that Gieseking has not met his burden to demonstrate otherwise.

At trial the testimony regarding equipment consisted of the fact that after the sales transaction was consummated, the shareholders agreed to a notation to indicate that the inventory was overstated because five pieces of equipment had become somewhat obsolete. The shareholders who agreed to that notation were John Wolff, Ken Hendricks, Gieseking and Thomas. March 2, 2006 Transcript at 172. There was no testimony at trial to rebut this evidence. Accordingly, the Court finds that Thomas adequately explained the loss in regard to this asset (if, indeed, there was a loss regarding the equipment).

At trial, Gieseking presented a further argument to buttress his claim that

41

Thomas failed to explain a loss of assets. While Gieseking and Thomas's relationship primarily was a business one, Gieseking testified that outside of business, he would help Thomas fly hot air balloons. Id. at 37. Michael Garvey testified at trial that, as part of the process of analyzing the accounts receivable chart, he also "analyzed payments that were made to pay personal debt obligations and support personal hobbies of Mr. Thomas." Id. at 263. When asked how he reached the conclusion that these particular payments were not for the benefit of MEI, LLC, Garvey replied, " . . . I interviewed the company personnel that were available and talked to [the president of MEI Technology, LLC]. I don't know what possible business purpose a ballooning expenditure could have for the corporation." Id. at 264.

Apparently Gieseking sought to contend that, because there was at least one check written from MEI, LLC which purported to cover some expense associated with hot-air ballooning, Thomas embezzled funds from MEI, LLC for his own personal use, and therefore failed to explain satisfactorily the loss of those assets. This argument makes little sense to the Court. As Thomas' counsel pointed out at trial, "These [were] never funds that went to Mr. Thomas. So it's not that they aren't accounted for. Everybody knows where they were." Id. at 267.

Gieseking extended the argument further, however, maintaining that if MEI had paid some of Thomas' personal expenses, then it stood to reason that Thomas must have–being relieved of those obligations–had more money available to pay his

creditors. The Court did not find this argument persuasive at trial, and finds it no more persuasive now. The argument rests on a fallacy–that Thomas had a pot of money sufficient to pay all of his personal debts, and that when some of those debts were taken care of for him, more of the pot became available to pay business creditors. The Court looks at these facts another way–if Thomas was relying on MEI to pay some of his personal debts, it stands to reason that he did not have enough money to pay those personal debts, much less to pay business creditors.

While Gieseking raised this issue with regard to his § 727(a)(5) claim, it seems more logically directed to his § 523(a)(2)(A) claim. Gieseking argued at trial that the fact that Thomas chose to pay personal debts, rather than paying Gieseking, shows that Thomas never intended to pay Gieseking, and thus that Thomas' assurances that Gieseking would get paid were fraudulent. As discussed above, the Court does not find this argument persuasive.

Indeed, Gieseking's arguments in this regard carry a whiff of Fed. R. Evid. 404(b) taint. Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." In other words, a party cannot present evidence of some unrelated bad behavior in the past in order to show that the opposing party is a "bad person," and therefore must have done whatever the opposing party is accused of having done in the current case.

There are exceptions to Rule 404(b)–evidence of other bad acts is admissible

43

to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Thus, if a plaintiff has accused a defendant of sexually harassing her by frequently leaving inappropriate notes on her desk, she may present evidence to show that the defendant has left inappropriate notes on other employees' desks to show a pattern of behavior. Or a plaintiff may submit evidence that a defendant has stolen trade secrets in the past to show that the defendant had a motive to lie about stealing trade secrets in the present case.

But a party may not submit evidence of prior bad acts simply to demonstrate that the opposing party is a "bad guy," and therefore must've done whatever bad thing he is accused of doing in the current case. This is not the guise in which Gieseking sought to present evidence regarding the payment of personal expenses, but presentation of the evidence carries that implication. It seems to the Court that Gieseking seeks to convince the Court that Thomas was embezzling money from MEI, in order to demonstrate that he is the kind of person who would defraud Gieseking. The Court does not know, one way or the other, whether Thomas took money from MEI that he was not authorized to take in order to pay personal obligations. But even if there was proof that this was the case, that does not demonstrate that Thomas fraudulently lured Gieseking into agreeing to sell his MEI shares. And it has little or nothing to do with whether Thomas failed to adequately explain a loss of assets.

For these reasons the Court finds that the plaintiff has failed to prove by a

preponderance of the evidence that this debt is non-dischargeable in bankruptcy
under 11 U.S.C. § 727(a)(5).

## IV. CONCLUSION

This opinion serves as findings of fact and conclusions of law as required by
Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52.

Wherefore, **IT IS HEREBY ORDERED,** for the reasons set forth above, that
judgment is entered in favor of the defendant and against the plaintiff. The debt
owed to the plaintiff is discharged.

Dated at Milwaukee, Wisconsin, this 5ᵗʰ day of January, 2007.

BY THE COURT:

PAMELA PEPPER
United States Bankruptcy Judge

45